UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTAN WELCH,

Plaintiff,

v.

LEVEL 3 COMMUNICATIONS, LLC,

Defendant.

_____/

Case No. 15-13381

SENIOR UNITED STATES DISTRICT
JUDGE ARTHUR J. TARNOW

MAGISTRATE JUDGE STEPHANIE
DAWKINS DAVIS

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [33]**

Plaintiff Christan Welch worked under various managers at Defendant Level

3 Communications, LLC from 2000 to 2014. After suffering a grand mal seizure

and being diagnosed with multiple sclerosis in February 2013, she began working

from home full time. Christopher Vickers became Plaintiff's new manager in

November 2013. Between that time and the time of Plaintiff's termination in April

2014, there were a series of problems with several of Plaintiff's customers. Vickers

discussed these issues with Plaintiff, but ultimately decided to terminate her

employment.

Plaintiff filed this lawsuit in September 2015, alleging disability

discrimination in violation of the Americans with Disabilities Act ("ADA") and the

Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"). Defendants filed a Motion for Summary Judgment [33] upon the conclusion of the discovery process. The motion was timely briefed and the Court heard oral arguments on April 5, 2017.

Summary judgment for Defendants is appropriate because the evidence shows that at the time of Plaintiff's termination, Plaintiff was no longer qualified to perform the essential functions of her position. Therefore, she cannot establish a prima facie case of discrimination.

## FACTUAL BACKGROUND

The Court considers all the facts and evidence with all reasonable inferences in favor of Plaintiff. *See Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648 (6th Cir. 2012).

Level 3 Communications, LLC provides communication services to enterprise, government, and carrier customers. Christan Welch began working at Level 3's predecessor, Focal Communications, in December 2000. Focal, and Broadwing Communications, its successor, were acquired by Level 3 in or around 2007. The nature of Plaintiff's work remained the same throughout each acquisition. Plaintiff's responsibilities as a Customer Care Manager ("CCM") included "[b]eing the primary point of contact for Level 3 customers[,] [r]esolving

post-sales non-technical customer inquiries[, and] [c]oordinating the resolution of technical issues using interdepartmental resources."

Although Plaintiff was assigned to Defendant's Southfield office, Plaintiff worked from home three days per week between 2005 and 2012. Plaintiff worked from home nine out of every 10 days after returning from maternity leave in early 2012. Being at home did not impede Plaintiff's ability to be productive and do work. She set up an office space in her home with a laptop, printer, and headset, which she used to communicate with customers. Plaintiff's four-year-old son went to day care and her mother-in-law and older son cared for Plaintiff's two-year-old twins.

Plaintiff "was in the office every other week routinely" until she suffered a grand mal seizure in February 2013. At that time, she was diagnosed with multiple sclerosis. Plaintiff's doctor instructed Plaintiff to limit her driving as much as possible. When Plaintiff began driving again, in December 2013, she was only able to drive very short distances – to drop her children off at school, for instance, or to go grocery shopping. Plaintiff's disability did not prevent her from working, and she could have arranged transportation to get to work. It was simply more convenient for her to work from home.

Christopher Vickers became a Senior Manager of Customer Service after taking over from Plaintiff's previous manager, Nick Monroe, in November 2013. He oversaw a team of Level 3 customer care managers, including Plaintiff. Shortly after beginning his new role, Vickers called Plaintiff to introduce himself, learn a bit about her, and inquire as to why she worked from home. Plaintiff told Vickers about her MS, her seizures, and her driving restrictions. Vickers directed Plaintiff to file this information with HR. This was the only conversation Plaintiff had with Vickers about her medical condition.

Plaintiff thereafter entered into a formal telecommunications agreement with Level 3. Plaintiff did not go to the Southfield office at all between November 2013 and April 1, 2014, the date of her termination. Plaintiff and Vickers never actually met in person, although they spoke frequently on the phone, and via email and Instant Messenger.

It appears that Plaintiff's alleged problematic behavior with customers began in November 2013. Several clients – including Clear Rate, Grid 4 Communications, T1, and Easton – made a variety of complaints to different individuals at Level 3 about Plaintiff's performance. Clear Rate, for instance, wanted Plaintiff to communicate on a more consistent, established schedule. In December 2013, Tim Wood, the Director of Sales and Support, advised Plaintiff to

improve her communication with T1 and that T1 needed "hand holding." He also stated that "an email tracker isn't cutting it for them. We need more specific updates." Plaintiff failed to respond in a timely manner to messages from employees at Easton and Clear Rate. Finally, Grid 4 asked that Plaintiff be removed from its account.

In March 2014, Plaintiff and Vickers discussed Plaintiff's subpar performance. Vickers told Plaintiff that she needed to improve her communication and escalation management. Plaintiff recognized that she was at risk of being placed on a Performance Improvement Plan ("PIP") if Vickers did not see immediate improvement. A PIP was not guaranteed, however. According to Maryanne Kanaskie, the Human Resources Manager at Level 3, the company had no progressive disciplinary process, but instead, "manage[d] each situation for the circumstances." Disciplinary action could consist of "a written warning that's issued for something," or "[i]t could be a performance plan or . . . it could be termination of employment."

Vickers stated that not only were Defendant's customers upset with Plaintiff, members of Defendant's sales team were as well. Defendant believed that Plaintiff prioritized her children over her work assignments. Vickers and Wood both testified that when they called Plaintiff at different times, a child answered the

phone and then abruptly hung up. Wood did not remember how many times this occurred, but he recalled "this not being a unique story."

In Plaintiff's view, Vickers did not actively support her. She found him unresponsive and hard to get in touch with. He often referred her questions to someone else within her group, which was unhelpful because she needed a response from someone at a higher level. Plaintiff also felt that Vickers "never made an effort to have a conversation with me on my disability in my work environment. He put forth no effort to understand me . . . all he did was make it worse . . . he built a case to get rid of me." Although Vickers never said anything directly to Plaintiff about her disability, Plaintiff was uncomfortable with Vickers' tone and attitude. Plaintiff did not feel like "a valuable employee on [Vickers'] team." She said that he treated her "as an outcast with a disability."

Plaintiff has no evidence or any reason to believe that this was because of her disability. Plaintiff spoke with Human Resources several times between November 2013 and March 2014 and never complained of Vickers' alleged discrimination against her.

Vickers and Kanaskie called Plaintiff on April 1, 2014 to inform her that she was being terminated. Vickers testified that he had to call Plaintiff twice in order to

reach her because the first time he called, a child picked up the phone and then hung up.

ANALYSIS

Plaintiff brings discrimination actions under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203, *et seq*., and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), M.C.L. § 37.1602. Because Plaintiff offers only circumstantial evidence in support of her claims, the Court will apply the *McDonnell-Douglas* burden-shifting framework. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc). If Plaintiff establishes a prima facie case, the burden shifts to Defendant to articulate non-retaliatory reasons for the challenged actions, after which the burden shifts back to Plaintiff to show that those reasons are a pretext for retaliation. *See id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 515 (1993)).

**I.    Prima Facie Case of Discrimination**

The parties agree that the Court should use the same standards to examine Plaintiff's ADA and PWDCRA claims. *See Donald v. Sybra, Inc.,* 667 F.3d 757, 763 (6th Cir. 2012) (the "PWDCRA 'substantially mirrors the ADA and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'") (internal quotations omitted). To prove a prima facie case of

disability discrimination using the *McDonnell-Douglas* framework, Plaintiff must show that (1) she is disabled, (2) she is otherwise qualified to perform the essential functions of the position, with or without accommodation, (3) she suffered an adverse employment decision, (4) Level 3 knew or had reason to know of Plaintiff's disability, and (5) the position remained open while Level 3 sought other applicants, or the disabled individual was replaced. *See Whitfield v. Tennessee*, 639 F.3d 253, 259-60 (6th Cir. 2011). "Establishing a prima facie case of discrimination under the indirect method is not onerous." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016).

Defendant acknowledges that Plaintiff has satisfied her burden on the third, fourth, and fifth elements. Accordingly, the Court's discussion will focus on whether Plaintiff was disabled and whether Plaintiff was otherwise qualified to perform the essential functions of her position as a CCM.

## A. Whether Plaintiff was Disabled as Defined by the ADA

An individual qualifies as disabled under the ADA if she has an impairment that substantially limits a major life activity; she has a record of such an impairment; or she is "regarded as having such an impairment." 42 U.S.C. §

12102(1).[1] The parties contest the disability requirement in different ways: Plaintiff argues that she is regarded as disabled, under 42 U.S.C. § 12102(1)(C), while Defendant claims that Plaintiff is not disabled because she has no impairment that substantially limits a major life activity, under 42 U.S.C. § 12102(1)(A).

### 1. Plaintiff's medical conditions did not substantially impair a major life activity nor was she "regarded-as-disabled" by Defendant.

The ADA Amendments Act ("ADAAA"), which became effective on January 1, 2009, "changed the way courts are to review 'regarded as' claims under the ADA." *Jennings v. Dow Corning Corp.*, No. 12-12227, 2013 U.S. Dist. LEXIS 66803, at *21 (E.D. Mich. May 10, 2013). The ADAAA provides that

> '[R]egarded as' claimants no longer need to demonstrate that their employer believed them to be substantially limited in a major life activity. Instead, an individual is 'regarded as having such an impairment' if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, *whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity.*

---

[1] Similarly, to qualify as disabled under the PWDCRA, an individual must have an impairment that "substantially limits 1 or more of that individual's major life activities" or the individual must be "regarded as having a determinable physical or mental characteristic [which may result from disease, injury, congenital condition of birth, or functional disorder." M.C.L. § 37.1103(d)(i)(A), (iii).

*Id.* at *21-22 (citing 29 C.F.R. § 1630.2(l)(1) (emphasis added)).[2] "Whether an individual's impairment 'substantially limits' a major life activity is not relevant to coverage under paragraph (g)(1)(iii) (the 'regarded as' prong) of this section." § 1630.2(j)(2). Congress intended the ADA Amendments Act to "'reinstat[e] a broad scope of protection to be available under the ADA.'" *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 566 (6th Cir. 2009).

Under the "regarded as disabled" prong, "[i]t is enough that an employer took some adverse employment action *because of* some impairment, whether real or imagined, no matter how insubstantial."[3] *Jennings*, 2013 U.S. Dist. LEXIS 66803, at *22-23 (emphasis added). An impairment is:

> Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or any mental or psychological disorder, such as an intellectual disability . . . organic brain syndrome, emotion or mental illness, and specific learning disabilities.

29 C.F.R. § 1630(h).

---

[2] The ADAAA supersedes *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489 (1999), which held that 'regarded as' claimants had "to show that their employers believed them to be substantially impaired in a major life activity or unable to work in a broad class of jobs." *Jennings*, 2013 U.S. Dist. LEXIS 66803, at *21.

[3] To meet the disability definition of "being regarded as having such an impairment," the impairment must have an actual of expected duration of more than six months. 42 U.S.C. § 12102(3)(B).

Plaintiff's arguments are unclear – she seems to argue that she is disabled both because her physical and mental impairments substantially limited a major life activity, and because Defendant regarded her as disabled. She states that she was disabled due to her "seizure disorder, MS, and the consequences of medication 17 doses of five different medications she takes on a daily basis) [sic]." These impairments, she says, "led to more than 'feeling run down.' Her sight, strength, loss of sleep, needing low lights and quiet, almost daily seizures, headaches, numb hands, etc., all suggest that she qualifies as a traditionally disabled individual within definition one of the statute."

Plaintiff's argument is unconvincing in several respects. First, Plaintiff's affidavit, in which she outlines the above argument, contradicts her deposition testimony that she had no limitations as to typing, reading, hearing, or completing other job-related tasks. "[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." *Penny v. UPS*, 128 F.3d 408, 415 (6th Cir. 1997). Plaintiff testified during her deposition that she "could sit [at her desk in her home office] as long as [she] needed to do [the job]" and that "[o]ther than the normal aches and pains and having to stand up, [she was] able to sit at her desk and do [her] job." Second, there is no evidence that Plaintiff ever

informed Level 3 about anything other than her MS and seizure disorder; no one at the company knew of Plaintiff's issues with respect to her irregular sleeping patterns, headaches, vision and hearing problems, and exhaustion.[4]

Plaintiff also acknowledged that apart from the driving accommodation, she had no "further accommodations for [her] job." Indeed, the Medical Accommodation Request that she submitted to Level 3 in November 2013 indicates only partial restrictions on Plaintiff's driving and/or ability to operate machinery and Plaintiff's tolerance for stress. Finally, Plaintiff confirmed during her deposition that her MS and seizure disorder "only prevented [her] from getting in the car and driving to work"; it did not "prevent [her] from working once [she was] at work." She agreed that she could have traveled to the office via alternative means and that it was simply more convenient for her to work at home.

Level 3 certainly knew that Plaintiff needed to work from home and had a driving restriction because of her MS and seizure disorder. However, Plaintiff "cannot show that [her employer regarded her as disabled] . . . merely by pointing to that portion of the record in which [the employer] admitted that [it] was aware of [plaintiff's] medical restrictions and modified [plaintiff's] responsibilities based on them." *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000). Notably,

---

[4] *See, e.g.*, Pl.'s Ex. C at 62 (Plaintiff admitted that she did not request the ability to, for example, "come into work and be able to shut off the lights or go into a private office.").

Level 3 did not modify Plaintiff's responsibilities at all; the company allowed

Plaintiff to work from home, but the substantive responsibilities of her job never

changed. There is no evidence that Plaintiff's ailments substantially limited her

ability to do her job or that Defendant regarded her in such a manner.

### B. Plaintiff was not otherwise qualified to perform the essential functions of her position.

Ultimately, even assuming that Plaintiff either was disabled or was regarded

as disabled, the Court finds that at the time Level 3 terminated her, she was no

longer qualified to perform the essential functions of her job. In order for Plaintiff

to show that she was qualified, she must prove that she was performing her job "at

a level which met [her] employer's legitimate expectations." *Huhn v. Koehring*,

718 F.2d 239, 243 (7th Cir. 1983). "If [Plaintiff] was not doing what [her]

employer wanted [her] to do, [she] was not doing [her] job . . . [Plaintiff] does not

raise a material issue of fact on the question of the quality of [her] work merely by

challenging the judgment of her supervisors." *Kephart v. Institute of Gas*

*Technology*, 630 F.2d 1217, 1223 (7th Cir. 1980), *cert. denied*, 450 U.S. 959

(1981). The focus is whether Plaintiff's objective qualifications qualified her for

her position as a CCM. *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 575

(6th Cir. 2003) (en banc).

That Plaintiff was successful at her job at one point, and received solid evaluations throughout the years, is undisputed. When Vickers first began working at Level 3, former managers and members of the sales team told him that Plaintiff used to be "on form," that she had not been lately, but they thought she could be again.

It is also true, however, that Vickers, members of the sales team, and Level 3 customers were dissatisfied with Plaintiff's job performance. Plaintiff concedes that her communications with Grid 4 and Easton were inexcusably delayed. Grid 4 was upset with the level of service it had received and lacked understanding of how the project was progressing. Grid 4 eventually asked that Plaintiff be removed from the account "due to the quality of [her] updates." Easton, another of Plaintiff's accounts, experienced similar issues. On December 4, 2013, Denise, an Easton employee, wrote to Plaintiff asking about whether something had been installed. The next morning, Plaintiff told Denise she would follow up later that day. Denise wrote back and asked Plaintiff to "keep us posted with the progress." Over the course of the next several days, Denise sent the following messages without receiving responses from Plaintiff:

- December 9, 2013: "I need status on this order – ASAP."
- December 10, 2013: "Christan, I need an update today, if you cannot obtain one can you please get someone else to look into this for me. I would really appreciate it!!!!!!!"

- December 11, 2013: "What is it going to take to get a reply back on this request, please advise."

Vickers finally responded by saying "Please accept my apology for the unacceptable delay in response on this matter. . . . You can expect a call from Christan in the morning to discuss next steps."

Vickers spoke with Plaintiff about her performance at some point in December 2013. They discussed Plaintiff's "performance being subpar" and how she could do better. Plaintiff took "responsibility for . . . the issues that occurred with [her] customers that Mr. Vickers was upset with [her] about." She also admitted that her "dealings with [that customer] were not the best display of [her] talents."

In Plaintiff's 2013 year-end review, Vickers indicated that these events were "a poor measure of [Plaintiff's] performance and under some circumstances would have resulted in severe disciplinary action which could have included separation." Vickers believed that Plaintiff could "get back in the game," but urged her "to commit to the team and focus on the job."

The evidence also shows that Plaintiff had communication issues with Clear Rate. Plaintiff acknowledged that Clear Rate was "raising issues with Mr. Vickers" regarding her work on the account. On December 17, 2013, Erin Knight, Plaintiff's contact at Clear Rate, emailed Plaintiff and Michael Cierebiej, another salesperson,

asking them to process an order. Ms. Knight emailed Cierebiej and Plaintiff again on January 3, 2014 asking about the status of the order. 11 days later, on January 14, Ms. Knight emailed Plaintiff (and copied Cierbiej) saying "Please provide a response as requested on the 3rd!" Immediately after that, Cierbiej responded to Ms. Knight and copied Plaintiff and Vickers, and said, "Chris can you assist?"

Plaintiff and Vickers reviewed her evaluation together once it was finalized, in approximately February or March of 2014. Plaintiff never complained to anyone at Level 3 about the substance of her review. When asked whether she disagreed with it, she said "yes and no"; she "was pissed with some of [Vickers'] verbiage but, hey, guess what, I got ten grand and he's giving me a bonus."

Even viewing the facts in the light most favorable to Plaintiff, the Court finds that she has not met her burden of showing that she was otherwise qualified for her job as a CCM with Level 3. In addition to the aforementioned problems with Level 3 customers, Plaintiff acknowledged that there were several times that her children answered her cell phone when her supervisors called. Plaintiff's counsel pointed out during the hearing that when this happened once with Tim Wood, Plaintiff was speaking with Vickers on Instant Messenger. Counsel noted that Wood never followed up as to why he called. This is irrelevant. What is relevant is Plaintiff's lack of professionalism and good judgment on such

occasions. Plaintiff's counsel also contends that "with the use of cell phones, on occasion, work-related phone calls will be fielded by someone other than the intended." This is questionable given the fact that Plaintiff had set up an office space at home and her older son and mother-in-law provided child care to her two-year-old twins while she worked. In theory, Plaintiff's children should not have been around her at all and should not have had any access to her phone.

The parties vehemently dispute the nature of Plaintiff's involvement with the Clear Rate account. It is Plaintiff's position that she had nothing to do with the failure of the Clear Rate circuits and that she was wrongfully blamed by Vickers and others at Level 3. Even assuming that Plaintiff is correct, it is very clear that a multitude of other issues existed with regard to her performance at Level 3. Plaintiff's counsel's claim that "[t]here is nothing in any email from any customer" about Plaintiff's lack of responsiveness is simply wrong. Employees from Easton and Clear Rate complained about Plaintiff's failure to answer emails; one email from Thane Namy at Clear Rate to Tim Wood and Plaintiff states: "Is there a reason Christian isn't answering Erin's questions?" And further, the fact that Plaintiff was removed from an account – Grid 4 – provides enough reason for Level 3 to terminate her, given that its job is to provide telecommunication services to clients.

The goal of the inquiry is "not to review bad business decisions, or question the soundness of an employer's judgment." *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990). The fact of the matter is that Plaintiff "was simply not performing to [Level 3's] satisfaction." *Id.* Accordingly, there is no genuine issue of material fact as to whether she was qualified. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiff has failed to establish a prima facie case of disability discrimination, and summary judgment under the *McDonnell Douglas* approach is appropriate.

## II.    Evidence of Pretext

Even assuming that Plaintiff established her prima facie case, she has not shown that Defendant's explanation for her firing was a pretext for discrimination. Level 3 claims to have terminated Plaintiff because of her poor performance, which is a valid reason. It is now up to Plaintiff to prove that this reason is pretextual, which she can do by showing that Defendant's proffered reason (1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012). "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

The Sixth Circuit recognizes the "honest belief" rule, which provides "that as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately found to be mistaken." *Ferrari*, 826 F.3d at 895. The employer's intent is what matters here; "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). The honest belief rule is satisfied if "the employer can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

The facts before Vickers, Wood, and other supervisors at Level 3 at the time of Plaintiff's termination are related above. All of this provides ample justification for Plaintiff's termination and, more importantly, there is simply no evidence in the record indicating that Defendant had any type of discriminatory intent. *See Treadway v. Cal. Prods. Corp.*, 2016 U.S. App. LEXIS 14212, at *210 (6th Cir. Aug. 1, 2016) (explaining that employees are not protected "from erroneous or even arbitrary personnel decisions but only from decisions that are unlawfully motivated.").

## III.  "Other Acts" Evidence

Plaintiff references the termination of Kevin Berg to support her argument

that Vickers discriminated against disabled individuals. She states:

> Vickers, [sic] engaged in almost the precise behaviors as stated by Welch,
> i.e. circumstances suggesting a disability leading to judgment of termination
> and a reluctance to use Defendant's policies (PIP and written warning) [sic]
> to rehabilitate the employee).

Berg worked at Level 3 for seven years until his termination in February

2014. Nick Monroe, Berg's former manager, placed him on a PIP in April 2013,

right before he left on medical leave. Shortly after Berg returned in September

2013, Vickers became his manager. According to Berg, "[a]lthough Mr. Vickers

appeared to want to work with me to successfully complete the terms of the PIP, I

always had an uneasy feeling dealing with him that he was someone who could not

evaluate me fairly." Berg also believed that his firing by Vickers "was predictable,

given [Vickers'] perception of me as someone who is dysfunctional in the

evaluation [Vickers] gave me wherein he wrote 'I do need you to be a dependable,

functioning employee . . .' I felt this was a thinly veiled reference to the five

months I needed off work to rehabilitate myself for employment."

"'[O]ther acts' evidence consists of testimony or other evidence of

discrimination by the employer against non-party employees." *Griffin v.*

*Finkbeiner*, 689 F.3d 584, 598 (6th Cir. 2012). "Whether such evidence is relevant

is a case-by-case determination that 'depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" *Id.* (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)).

There is no evidence that Berg was disabled. After Berg returned from his medical leave in September 2013, he did not inform Defendant of any restrictions or request any accommodations. "[A]n employer cannot be said to know or have reason to know of an employee's disability where that employee returns to work without restriction or request for accommodation. The natural assumption in such a case is that the employee is fully fit for work." *Hubbs v. Textron, Inc.*, 2000 U.S. App. LEXIS 30465, at *7 (6th Cir. 2000). Plaintiff cherry picks "uncorroborated, conclusory statements and self-serving allegations" from Berg's affidavit in support of her claim; these statements "cannot alone satisfy Plaintiff's burden." *Brahmbhatt*, 2014 U.S. Dist. LEXIS 81592, at *39 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992)). It should also be recognized that Monroe – not Vickers – initiated the disciplinary process by placing Berg on the PIP, and moreover, that Vickers was the one who released Berg from the PIP after Berg "satisfactorily achieved the objectives that were established." Finally, Berg's

speculative, subjective beliefs as to his "uneasy feeling" about Vickers are insufficient to establish discrimination. *See Mitchell*, 964 F.2d at 585.

## CONCLUSION

Plaintiff cannot establish a prima facie case of disability discrimination because there is no genuine issue of material fact as to whether she was qualified for her position as a CCM. It is also clear that – even assuming Plaintiff could make out a prima facie case – Plaintiff has not met her burden of showing that Level 3's reasons for terminating her were pretext for unlawful disability discrimination. Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [33] is **GRANTED**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: May 26, 2017          Senior United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S Mail addresses disclosed on the Notice of Electronic filing on May 26, 2017.

s/Teresa McGovern
Case Manager Generalist